1  Dale C. Campbell, State Bar No. 99173
   Scott Hervey, State Bar No. 180188
2  W. Scott Cameron, State Bar No. 229828
   Zach Wadlé, State Bar No. 231404
3  **WEINTRAUB GENSHLEA CHEDIAK**
   Law Corporation
4  400 Capitol Mall, 11th Floor
   Sacramento, California   95814
5  (916) 558-6000 – Main
   (916) 446-1611 – Facsimile
6
   Attorneys for Plaintiff
7  Digital Software Services, Inc.

8

9                    UNITED STATES DISTRICT COURT

10                  EASTERN DISTRICT OF CALIFORNIA

11

12  DIGITAL SOFTWARE SERVICES, INC., a          )   Case No.
    California corporation,                     )
13                                              )
                Plaintiff,                      )
14                                              )   COMPLAINT FOR:
          vs.                                   )
15                                              )   1. COPYRIGHT INFRINGEMENT
    ENTERTAINMENT PROGRAMS, INC., a             )       [17 U.S.C. § 501];
16  California corporation; JOSEPH A. PERSHES,  )   2. TRAFFICKING IN COUNTERFEIT LABELS
    individually and as an officer and owner of )       [18 U.S.C. § 2318];
17  ENTERTAINMENT PROGRAMS, INC.; KOCH          )   3. TRADEMARK INFRINGEMENT
    ENTERTAINMENT DISTRIBUTION, LLC, a          )       [15 U.S.C. § 1125(a)];
18  Delaware limited liability company; INGRAM  )   4. CIVIL RICO
    ENTERTAINMENT, INC., a Tennessee            )       [18 U.S.C. § 1962(c)]; and
19  corporation; CD VIDEO MANUFACTURING,        )   5. CONSPIRACY TO VIOLATE RICO
    INC., a California corporation; and         )       [18 U.S.C. § 1962(d)]
20  L&M OPTICAL DISC WEST, LLC, a California     )
    limited liability company,                  )
21                                              )
                Defendants.                     )   DEMAND FOR JURY TRIAL
22                                              )
                                                )
23  _____  )

24

25                          INTRODUCTION

26        Plaintiff Digital Software Services, Inc. ("DSS" or "Plaintiff") owns all rights, including

27  copyrights, in a series of ten aviation-themed videos about World War II era warplanes titled

28  the Roaring Glory Warbirds.  DSS controls the distribution of these videos by marketing them

itself or through tightly controlled distribution agreements. One of these agreements was with Defendant Joseph Pershes ("Pershes"), and his company Entertainment Programs, Inc. ("EPI"). After EPI and Pershes failed to pay the required royalties for the sales of the videos, the distribution agreement was cancelled.

Pershes did not stop distributing the videos, however. Unbeknownst to DSS or its owners, Pershes joined forces with Defendant Koch Entertainment, Inc. ("Koch") and several DVD replicators, including Defendants CD Video Manufacturing, Inc. ("CD Video"), L&M Optical Disc West ("L&M West") and others. Together, they began making counterfeit copies of the Roaring Glory Warbirds videos and selling them for themselves. Notwithstanding several demands that they cease and desist making and selling counterfeit copies of DSS's copyrighted works, Defendants continue to do so.

## THE PARTIES

1.      Plaintiff Digital Software Services, Inc. ("DSS") is a corporation formed pursuant to the laws of California, duly authorized to do business in this state, with its headquarters and primary place of business in Butte County, California.

2.      DSS is informed and believes that defendant Entertainment Programs, Inc. ("EPI") is a corporation formed under the laws of California, duly authorized to do business in this state, with its headquarters and primary place of business in Los Angeles County, California, and regularly doing business in the Eastern District.

3.      Defendant Joseph A. Pershes is an individual. DSS is informed and believes that Pershes is a California resident, residing in Los Angeles County. DSS is informed and believes that Pershes is the president and owner of EPI and regularly does business in the Eastern District.

4.      DSS is informed and believes that defendant Koch Entertainment Distribution LLC ("Koch") is a limited liability corporation formed under the laws of Delaware, with its headquarters in New York, and is registered to do business and regularly does business in this state and in the Eastern District.

///

5.    DSS is informed and believes that defendant Ingram Entertainment, Inc. ("Ingram") is a corporation formed under the laws of Tennessee, with its headquarters in La Verne, Tennessee, with facilities in Orange, California, and is registered to do business and regularly does business in this state and in the Eastern District.

6.    DSS is informed and believes that defendant CD Video Manufacturing, Inc. ("CD Video") is a corporation formed under the laws of California, duly authorized to do business in this state, with its headquarters and primary place of business in Orange County, California.

7.    DSS is informed and believes that defendant L&M Optical Disc West, LLC ("L&M West") is a California limited liability corporation, duly authorized to do business in this state, with its headquarters and primary place of business in Los Angeles County, California.

JURISDICTION AND VENUE

8.    Jurisdiction in the District Court is based upon 28 U.S.C. § 1331, federal question, in that the action arises out of violations of the Copyright Act, 17 U.S.C. § 501, the Lanham Act, 15 U.S.C. § 1125(a), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Supplemental jurisdiction of the state law claims is proper under 28 U.S.C. § 1367.

9.    Venue is proper in the Eastern District pursuant to 28 U.S.C. §§ 1391 and 1400, in that a substantial portion of the events giving rise to the dispute arose in this district, the harm was sustained in this district, and at least one Defendant is found in this district.

Ownership Of The Roaring Glory Videos

10.    In the early 1990s, Teleteam, Inc. produced a series of ten videos about World War II airplanes. This video series was called "Roaring Glory" (the "Roaring Glory Videos") and included videos featuring the B-17 Flying Fortress, the B-25 Mitchell Bomber, the Curtis P-40 Warhawk, the P-51 Mustang, and others. Teleteam registered the copyrights of the four titles listed above, including the artwork and packaging, with the United States Copyright Office in 1992. The videos generally describe in detail the airplane that is the subject of the video, including a tour of the airplane led by a pilot who then takes the viewer on a recorded

flight in the airplane. Each video also includes interviews with pilots and stories of those that flew the airplanes in combat, with some actual combat footage and gun camera film. Teleteam entered into an exclusive worldwide marketing and distribution agreement with Program Power Entertainment, Inc. ("Program Power"). Under this agreement, Program Power obtained exclusive control over the rights in all of the Roaring Glory Videos, including ownership of the copyrights.

11. In late 2003, Program Power assigned the copyrights of the Roaring Glory titles to DSS, which had been formed to market and distribute the Roaring Glory Videos, and to create new state-of-the-art versions of the videos. DSS filed registrations for the remaining six Roaring Glory Videos, including the artwork and packaging, with the United States Copyright Office. Program Power also assigned the trademarks it owned, including "Program Power" and "Roaring Glory Warbirds" to DSS in late 2003.

12. DSS has also produced a second version of each of the ten Roaring Glory Videos, and has registered the copyrights of each of the videos in the second version, again including the artwork and packaging, with the Copyright Office. The actual feature video itself is the same in both versions of each title, but the second version contains extra features not present in the original.

<u>Distribution Of The Roaring Glory Videos</u>

13. Program Power sold and distributed the Roaring Glory Videos via the Internet, through air museums, and through catalogs to the special interest aviation enthusiast market. Program Power was a niche marketer of these videos, with little true competition as few similar videos had been produced. Program Power sold the videos under the mark and name "Roaring Glory Warbirds" from 1993 until 2003. Accordingly, the mark and name "Roaring Glory Warbirds" has become synonymous with Program Power in the aviation video industry through Program Power's efforts and expense in marketing the videos. DSS has been distributing the Roaring Glory Videos since Program Power assigned the trademark in late 2003, and has been using the Roaring Glory Warbirds name and mark since that time. Through this use, DSS has also become synonymous with Roaring Glory Warbirds. In fact, the

weintraub genshlea chediak
LAW CORPORATION

1  new version of each of the Roaring Glory Videos that DSS created and released in 2007 also

2  uses the Roaring Glory Warbirds name and mark.

3      14.    In 2002, Program Power entered into a distribution agreement ("Distribution

4  Agreement") with EPI.  Pursuant to the Distribution Agreement, EPI became Program Power's

5  exclusive distributor in the United States and Canada of all video titles covered by the

6  agreement, which included various family outdoor adventure titles, several hard-to-find horror

7  films, and the Roaring Glory Videos.  However, under the Distribution Agreement, Program

8  Power retained the right to sell its titles, including the Roaring Glory Videos, on its own website.

9  It also retained the right to sell the Roaring Glory Videos to air museums, via catalogs, and to

10  the special interest aviation enthusiast market.  The Distribution Agreement did not grant EPI,

11  or anyone else, the right to copy or replicate any of Program Power's titles.  The Distribution

12  Agreement specifically provides that Program Power's express authorization was required for

13  each replication.  Further, the Distribution Agreement did not grant EPI, or anyone else, the

14  right to replicate any of the titles covered by the Agreement.  Program Power first had to

15  approve the replicator and then required a separate Replicator Access Letter ("RAL") be

16  executed before Program Power would agree to provide the replicator the required masters to

17  replicate the titles.  Pursuant to the RAL, each order for additional copies had to be approved

18  by Program Power.

19      15.    Under the Distribution Agreement, EPI was required to pay Program Power

20  70 percent of the revenue from EPI's sales, and was required to submit a monthly accounting

21  of all sales and inventory to Program Power.  The Distribution Agreement was effective

22  October 1, 2002, and ran through October 1, 2007 unless terminated for cause prior to the

23  expiration.

24      16.    As incentive to enter into the Distribution Agreement, EPI and Program Power

25  entered into an agreement (the "Security and Financing Agreement") whereby EPI agreed to

26  loan Program Power $100,000.  EPI was to make this loan in two installments, the first on

27  October 1, 2002, and the second on December 20, 2002.  EPI did make these installment

28  payments to Program Power.  The loan was to be repaid out of Program Power's share of the

weintraub genshlea chediak
LAW CORPORATION

1  revenue from EPI's sales under the Distribution Agreement, with EPI retaining all revenue from

2  its sales until the loan was repaid.

3         17.    Pursuant to the Security and Financing Agreement, Program Power granted EPI a

4  security interest in the copyrights for four titles in the Roaring Glory Video series, including the

5  P-40 Warhawk, P-51 Mustang, B-25 Mitchell Bomber, and the B-17 Flying Fortress.  By the

6  terms of the Security and Financing Agreement, the security interest terminated when the

7  $100,000 loan was paid in full.

8         18.    EPI began distributing Program Power's titles in October 2002.  EPI's June 13,

9  2003 accounting to Program Power showed that at the end of May 2003, EPI's had retained

10  proceeds from the sales of Program Power's titles sufficient to repay the entirety of the

11  $100,000 loan.  The note was in fact repaid by the proceeds of these sales.  According to the

12  terms of the Security and Financing Agreement, any security interest EPI had in the Roaring

13  Glory Videos terminated at that time.

14         19.    From October 2002 until June 13, 2003, EPI had been complying with its

15  obligation under the Distribution Agreement to provide Program Power with an accounting of

16  all sales each month.  However, following the June 13, 2003 accounting which showed the

17  loan to be repaid, EPI stopped providing any accounting to Program Power for its sales.  EPI

18  did not pay Program Power any of the revenue from sales after May 2003, and has never paid

19  Program Power or DSS any portion of the revenue it received from sales of Roaring Glory

20  Videos.

21         20.    Program Power sent EPI several written requests for an accounting of sales and

22  payment pursuant to the Distribution Agreement following the June 13, 2003 accounting.

23  Program Power received no response to these communications.  Finally, on December 7,

24  2003, after having received no response from EPI, Program Power sent EPI a notice of default

25  of the Distribution Agreement and a demand that EPI cure the default.  The notice of default

26  was sent to Joseph Pershes, president of EPI, in accordance with the terms of section 13 of the

27  Distribution Agreement.  The notice of default listed EPI's breaches of the Distribution

28  Agreement and advised that if these breaches were not cured within 30 days, Program Power

weintraub genshlea chediak
LAW CORPORATION

1    would terminate the Distribution Agreement.

2        21.    EPI did not cure any of the breaches listed in the December 7, 2003 notice of

3    default.  In fact, EPI compounded the breaches by continuing to refuse to provide the monthly

4    accounting required in the Distribution Agreement and refusing to pay Program Power any

5    portion of the revenue EPI received from the sales of the Roaring Glory Videos.  On January 7,

6    2004, Program Power terminated the Distribution Agreement with EPI.  Program Power sent a

7    written termination notice in accordance with section 13 of the Distribution Agreement, and

8    Program Power's attorney sent a separate written notice of the termination to EPI on the same

9    day.  The termination notice included a demand that EPI return to Program Power all masters,

10    artwork, print material, and all materials of every nature and kind relating to Program Power

11    titles to Program Power.  Pursuant to this demand, and a similar demand made to Newstyle,

12    Inc., the replicator Program Power had approved to replicate the Roaring Glory Videos that EPI

13    distributed, Newstyle returned all masters and printer packaging and files for printing labels to

14    Program Power.  The termination notice was unequivocal that, effective January 7, 2004, EPI

15    was no longer authorized to distribute any of Program Power's titles.

16    <u>Pershes and EPI Manufacture and Sell Counterfeit Copies of the Roaring Glory Videos</u>

17        22.    Notwithstanding the notice of termination of the Distribution Agreement and

18    unbeknownst to DSS or Program Power, Pershes and EPI did not stop distributing the Roaring

19    Glory Videos.  DSS is informed and believes that after January 7, 2004, Pershes and/or EPI

20    contracted with CD Video to replicate some or all of the Roaring Glory Videos.  On or about

21    March 29, 2004, Pershes and EPI contracted with CD Video to produce 1,000 counterfeit

22    copies of one of the Roaring Glory Videos, titled *"P-47 Thunderbolt."*  DSS is informed and

23    believes that thereafter, additional copies of this and other Roaring Glory Videos were

24    replicated by CD Video under contract for Pershes and EPI.  CD Video has admitted that

25    between March 29, 2004 and February 28, 2007, it replicated over 21,000 counterfeit copies

26    of Roaring Glory Videos for Pershes and/or EPI.

27        23.    DSS is informed and believes that at the time Pershes and/or EPI contracted with

28    CD Video, neither EPI nor Pershes had masters of any of the Roaring Glory Videos or the

**weintraub** genshlea chediak
LAW CORPORATION

associated artwork.  DSS is informed and believes that Pershes and/or EPI provided CD Video with a non-master copy of the video and a color copy of the artwork for the packaging, a copy that was actually a finished good manufactured for sale to the public.  This is not normal practice in the video replicating industry, as a digital master is necessary for producing the highest quality copies of a DVD, and the original digital file of the artwork is necessary for creating the highest quality labels and packaging for the DVD.  The Distribution Agreement required Program Power to approve the use of each replicator before that replicator could be used to produce copies of the Roaring Glory Videos.  The Distribution Agreement also required Program Power, EPI, and the replicator execute a Replicator Access Letter prior to commencement of replication and required Program Power to approve each replication order.  Moreover, the Distribution Agreement specified that Program Power would provide the master of the videos directly to the approved replicator, and required that the masters be returned to Program Power following any approved replication.

24.    DSS is informed and believes that after January 7, 2004, Pershes used additional replicators, including L&M West and others, in the same manner as CD Video to replicate additional counterfeit copies of the Roaring Glory Videos without the use of masters, label files, or printed packaging.  Neither Program Power nor DSS authorized any of these additional replicators to produce copies of the Roaring Glory Videos, and neither executed a Replicator Access Letter with any of them.  DSS has purchased copies of the Roaring Glory Videos which turned out to be counterfeit and which indicate that CD Video, L&M West, and possibly others, replicated the counterfeit videos.

25.    The copies of the Roaring Glory Videos that Pershes and EPI are marketing and distributing are of significantly lower quality than the genuine videos marketed and distributed by Program Power and then DSS due to the lack of masters for replicating the videos and the artwork.  These copies of videos are counterfeit in that they are portrayed and presented as original videos produced by Program Power but were copied and marketed without Program Power's or DSS's authorization and without use of the masters to create the same high-quality product that Program Power is known for.

**weintraub** genshlea chediak
LAW CORPORATION

26.    DSS is informed and believes that sometime in 2004 or 2005, Pershes and EPT entered into an agreement with Koch regarding distribution of certain video titles which EPI had been marketing.  DSS had no knowledge of this exclusive distribution deal and had no reason to know of it.  DSS is informed and believes that this agreement included counterfeit copies of the Roaring Glory Videos.

27.    DSS is informed and believes that neither Pershes, Koch, nor EPI had masters of the any of the Roaring Glory Videos or the artwork.  DSS never gave Pershes, EPI, or Koch the masters of the videos or the artwork.  Similarly, Program Power never gave Pershes, EPI, or Koch the masters of the videos or the artwork.  Neither DSS nor Program Power ever approved the use of a replicator to replicate the videos and never signed a Replicator Access Letter allowing any replicator to manufacture copies of the videos for Pershes, EPI, or Koch.  Neither DSS nor Program Power ever provided the masters to any replicator for Pershes, EPI, or Koch to obtain copies of the Roaring Glory Videos.

28.    Koch knew, or should have known, that it did not have the right to replicate or distribute the Roaring Glory Videos.  The videos themselves, on both the artwork and the disk, listed Program Power as the copyright owner, and Program Power had not provided any permission to Koch to distribute any videos in the series.

29.    DSS is informed and believes that Koch, EPI, and Pershes continued to market and distribute the counterfeit videos in the Roaring Glory Video series despite the fact that they each knew they had no right to market or distribute any of the titles in the series.  DSS is informed and believes that Koch, Pershes, and/or EPI engaged numerous DVD replicating companies to manufacture tens of thousands of illegal counterfeit copies of the Roaring Glory Videos.  As mentioned, the counterfeit copies manufactured by and for them included a copyright notice indicating that Program Power owned the copyright, and Program Power had not authorized any replicator to make copies of the videos.  DSS is informed and believes that Koch, Pershes, and/or EPI sold the counterfeit copies of the Roaring Glory Videos through various distribution channels.  Neither DSS nor Program Power received any of the proceeds from these sales.

30.    In late May 2007, DSS received a call from a representative of "The Wright Brothers," one of the aviation print catalogs to which DSS sells Roaring Glory Videos.  The Wright Brothers representative told DSS that Pershes had called The Wright Brothers and offered to sell it Roaring Glory Videos at a lower price than DSS was selling them.  This telephone call from the Wright Brothers was the first indication that DSS had that Pershes was selling illegal copies of the Roaring Glory Videos.  The call from Pershes to The Wright Brothers offering to sell Roaring Glory Videos was fraudulent, in that Pershes knew that he did not have authorized, genuine Roaring Glory Videos to sell and that the copies he was selling were counterfeit.  DSS is informed and believes that the Wright Brothers was deceived into purchasing approximately 400 units of counterfeit Roaring Glory Videos from Pershes.  The representative from The Wright Brothers later told Pershes that he only purchased the latest and best versions of the Roaring Glory Videos from DSS, and refused to purchase any additional copies from Pershes.

31.    DSS is informed and believes that Pershes made similar telephone calls to other aviation-related catalogs with the intent of inducing these catalogs to purchase his counterfeit copies of the Roaring Glory Videos at a lower price than DSS was selling the authentic copies and that some or all of these catalogs agreed to purchase Roaring Glory Videos from Pershes. DSS ordered and paid for several videos in the Roaring Glory Video series from Historic Sales, another print catalog, and received counterfeit DVDs.  These videos were sold at a price significantly lower than the retail price suggested by DSS for its videos and were of far lower quality.  The artwork on the disk itself, and on the packaging, was fuzzy rather than the sharp, clear artwork on the authentic disks and packages.

32.    DSS contacted Historic Sales in October 2007, regarding the sale of counterfeit Roaring Glory Videos.  Historic Sales agreed to stop selling counterfeit copies of the Roaring Glory Videos and informed DSS that it had been purchasing its Roaring Glory Videos from Ingram.  DSS is informed and believes that Ingram purchased the counterfeit copies of the Roaring Glory Videos it was distributing from Pershes or EPI.

///

33.    On or about May 14, 2008, Mark Reynolds, an employee of Koch, sent an email to the manager of Lonestar Flight Museum in Galveston, Texas, following up on a sales call he had made to her.  DSS is informed and believes that during that call, and in the email, Reynolds offered to sell Lonestar Flight Museum Roaring Glory Videos at a price much lower than the price at which DSS sells the videos.  On May 20, 2008, Reynolds sent another email following up on the solicitation.  The phone call and the emails were fraudulent in that Koch was not authorized to sell Roaring Glory Videos, Koch knew it was not authorized to sell Roaring Glory Videos, the videos it was purporting to sell as genuine Roaring Glory Videos were in fact counterfeit, and Koch knew that the videos it was selling as genuine Roaring Glory Videos were in fact counterfeit.

<u>FIRST CLAIM FOR RELIEF</u>

(Copyright Infringement, 17 U.S.C. § 501)

(Against All Defendants)

34.    DSS realleges and incorporates herein by reference the allegations in paragraphs 1 through 29 above as if set forth in full.

35.    DSS is the rightful owner of the copyrights in the Roaring Glory Videos, either through assignment or through registration with the United States Copyright Office.  DSS's copyright certificates are *prima facie* evidence of DSS's ownership of the copyrights in the Roaring Glory Videos described herein.

36.    Defendants, and each of them, infringed DSS's copyrights in the Roaring Glory Videos through the conduct alleged herein, including, but not limited to, manufacturing copies of DSS's copyrighted Roaring Glory Videos without authorization from DSS, distributing copies of DSS's copyrighted Roaring Glory Videos without authorization from DSS, and selling copies of DSS's copyrighted Roaring Glory Videos without authorization from DSS, all in violation of 17 U.S.C. § 501.

37.    The infringement of DSS's copyrights was willful and intentional.  Pershes, EPI, and Koch knew that they did not have the right to copy, distribute, and/or sell the Roaring Glory Videos because DSS and/or Program Power expressly told them they did not have

1  authorization to do so.  The replicators knew, or should have known, that they did not have the

2  right to replicate the Roaring Glory Videos because they did not have the authorization from

3  the copyright owner to do so.  The labels on the DVD's contained copyright notices identifying

4  Program Power as the copyright owner.  Program Power did not authorize Pershes, EPI, Koch,

5  and/or any of the replicators to replicate the videos.  Ingram knew, or should have known, that

6  it did not have the right to distribute the Roaring Glory Videos because the videos acknowledge

7  Program Power as the copyright owner, and Ingram knew it did not have Program Power's

8  authorization to distribute the videos.

9        38.    Defendants' infringing actions have caused DSS injury in the form of lost sales,

10  lost profits, and a reduction in market price for genuine Roaring Glory Videos because

11  Defendants were selling the counterfeit videos at a price much lower than the retail price set by

12  DSS.  DSS continues to be injured by this reduction in market price, and it will take many years

13  for the market to recover to the point where DSS can charge its customary, proper retail price,

14  and in fact the market may never recover to that point.  Defendants' infringing actions

15  therefore entitle DSS to recover its actual damages and Defendants' profits in accordance with

16  17 U.S.C. § 504.

17        39.    Defendants' infringing actions have caused, and continue to cause, irreparable

18  injury to DSS's reputation, standing, and position in the aviation video industry and among

19  DSS's customers by flooding the market with counterfeit copies of DSS's copyrighted videos

20  that are substantially lower quality than the genuine videos sold and distributed by DSS.

21  Defendants' actions therefore entitle DSS to temporary and permanent injunctive relief pursuant

22  to 17 U.S.C. § 502.  Pershes, EPI, and Koch were all sent letters directing them to cease and

23  desist their infringement of DSS's copyrighted material.  Notwithstanding this demand, Koch

24  continues to carry the Roaring Glory Videos in its Business to Business Catalog in violation of

25  DSS's copyrights.

26        41.    Defendants' infringing actions also entitle DSS to recover its full costs in bringing

27  this action, including reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

28        WHEREFORE, DSS prays for judgment as set forth below.

**weintraub** genshlea chediak
LAW CORPORATION

## SECOND CLAIM FOR RELIEF

### (Trafficking In Counterfeit Labels, 18 U.S.C. § 2318)

### (Against All Defendants)

42.   DSS realleges and incorporates herein by reference the allegations in paragraphs 1-36 above as if set forth in full.

43.   DSS is informed and believes that Defendants, and each of them, have knowingly affixed, or caused to be affixed, counterfeit labels and packaging to the Roaring Glory Videos, which were copyrighted motion pictures or audiovisual works, that Defendants illegally produced.   These labels and packaging are intended to, and do, appear to be genuine, but are not.   As described above, they are not genuine because they were copied without authorization and without use of the master artwork, resulting in copies that are fuzzy and of lower quality than the genuine label and packaging.   They appear to be genuine because, although lower in quality, they are otherwise exact copies of the genuine labels and packaging used by DSS.

44.   DSS is informed and believes that Defendants, and each of them, transported or transferred the Roaring Glory Videos with the counterfeit labels and packaging to others for commercial advantage or private financial gain.

45.   The counterfeit label is affixed to a copy of a Roaring Glory video, a copyrighted motion picture, or other audiovisual work.   The counterfeit packaging that accompanies the video is also copyrighted along with the video.

46.   DSS is the copyright owner of the Roaring Glory Videos as described above and was injured by Defendants' violation of 18 U.S.C. § 2318(a).

47.   DSS is therefore entitled to civil remedies for Defendants' trafficking in counterfeit labels and packaging as described herein pursuant to 18 U.S.C. § 2318(e). Specifically, DSS is entitled to the full retail price for the genuine copy of each counterfeit video produced, transferred, or transported by Defendants, which full retail price is $19.99, whether sold by Defendants or not, without deduction for costs, in accordance with 18 U.S.C. § 2318(e).

**weintraub** genshlea chediak
LAW CORPORATION

48. DSS is also entitled to recover its reasonable attorneys' fees and costs incurred in bringing this action pursuant to 18 U.S.C. § 2318(e).

WHEREFORE, DSS prays for judgment as set forth below.

<u>THIRD CLAIM FOR RELIEF</u>

(Trademark Infringement, 15 U.S.C. § 1125(a))

(Against All Defendants)

49. DSS realleges and incorporates herein by reference the allegations in paragraphs 1 through 43 above as if set forth in full.

50. DSS is the owner of the unregistered trademark "Roaring Glory Warbirds." Program Power began using this mark in commerce in 1993 in connection with the sale and marketing of the Roaring Glory Videos described herein. Program Power assigned its rights and interests in the trademark to DSS, and DSS itself has been using the mark in commerce since 2004 in connection with the sale and marketing of the Roaring Glory Videos described herein.

51. The mark "Roaring Glory Warbirds" is inherently distinctive, as it is either a fanciful or suggestive mark.

52. Although not necessary to be entitled to protection, the mark "Roaring Glory Warbirds" has attained secondary meaning within the aviation video industry, identifying the item to which the mark is affixed as a video produced by Program Power and/or DSS through over 15 years of use in commerce in marketing these videos.

53. The videos manufactured, sold, and distributed by Defendants, and each of them, all bore the "Roaring Glory Warbirds" mark. The use of the "Roaring Glory Warbirds" mark on the counterfeit videos as described above is likely to cause confusion or to deceive as to the source or origin of the video. The use of the mark is likely to cause the purchaser to believe that the video is a genuine Roaring Glory video produced by DSS, when in fact it is a lower-quality counterfeit copy of the videos produced by DSS.

54. Defendants' actions as described herein are violations of 15 U.S.C. § 1125(a), entitling DSS to recover damages in the amount of three times DSS's actual damages,

Complaint

*weintraub* genshlea chediak
LAW CORPORATION

1    Defendants' profits, and DSS's costs pursuant to 15 U.S.C. § 1117(a).

2         55.    Defendants' actions as described herein were willful, intentional, and designed

3    to harm DSS by keeping from DSS the profits of its invention, thereby making this case an

4    exceptional case entitling DSS to recover its reasonable attorneys' fees pursuant to 15 U.S.C.

5    § 1117(a).

6         WHEREFORE, DSS prays for judgment as set forth below.

7                          FOURTH CLAIM FOR RELIEF

8                        (Civil RICO, 18 U.S.C. § 1962(c))

9                           (Against All Defendants)

10        56.    DSS realleges and incorporates herein by reference the allegations in

11   paragraphs 1 through 50 above as if set forth in full.

12   The RICO Enterprise

13        57.    Defendants collectively constitute a group of individuals associated in fact

14   although not a legal entity, thereby constituting an associated-in-fact enterprise within the

15   meaning of RICO.

16        58.    The enterprise has a definite structure.  DSS is informed and believes that there

17   are written agreements between the Defendants that define the structure and hierarchy of the

18   enterprise and the role of each Defendant therein.

19        59.    The activities of the enterprise as described herein include replicating,

20   distributing, marketing, and selling DVD videos in interstate commerce.  DSS is informed and

21   believes that the enterprise replicates, distributes, markets, and sells DVD videos without the

22   use of any racketeering activities by replicating, distributing, marketing, and selling DVD videos

23   pursuant to proper license agreements.  In addition, however, DSS is informed and believes

24   that the enterprise engages in a pattern of racketeering activity as described below to carry out

25   portions of its affairs by replicating, distributing, marketing, and selling counterfeit DVD videos

26   and by fraudulently using the mails and wires to facilitate these activities.

27   ///

28   ///

**weintraub** genshlea chediak
LAW CORPORATION

1  Pattern of Racketeering Activity

2  Trafficking in Counterfeit Labels, 18 U.S.C. § 2318

3      60.    As described above, Defendants, and each of them, engaged in conduct that

4  constitutes trafficking in counterfeit labels and packaging affixed to copyrighted motion pictures

5  or other audiovisual works in violation of 18 U.S.C. § 2318.  This section is also listed as a

6  predicate offense in the definition of "racketeering activity" in 18 U.S.C. § 1961(1).

7      61.    The violations of 18 U.S.C. § 2318 described above were numerous and

8  systematic and occurred over several years from at least early 2004 and continue to the

9  present.  Therefore, these violations constitute a "pattern of racketeering activity" as defined by

10  18 U.S.C. § 1961(5).

11  Criminal Infringement of Copyright, 18 U.S.C. § 2319

12      62.    As described above, Defendants, and each of them, infringed DSS's copyrights

13  by copying, distributing, and selling DSS's copyrighted videos.  Moreover, this infringement was

14  willful and intentional.  Pershes, EPI, and Koch knew that they did not have the right to copy,

15  distribute, and/or sell the Roaring Glory Videos because DSS and/or Program Power expressly

16  told them they did not have authorization to do so.  The replicators knew, or should have

17  known, that they did not have the right to replicate the Roaring Glory Videos because they did

18  not have the authorization from the copyright owner to do so.  The counterfeit disks and

19  packaging all acknowledge Program Power as the owner of the copyright, and Program Power

20  did not authorize them to replicate the videos.  Ingram knew, or should have known, that it did

21  not have the right to distribute the Roaring Glory Videos because the videos acknowledge

22  Program Power as the copyright owner and Ingram knew it did not have Program Power's

23  authorization to distribute the videos.

24      63.    DSS is informed and believes that each Defendant's willful infringement of DSS's

25  copyrights was for commercial advantage or private financial gain in that each Defendant

26  separately profited from its role in the infringement.

27      64.    This willful infringement for commercial advantage or private economic gain

28  constitutes criminal infringement pursuant to 17 U.S.C. § 506(a), and 18 U.S.C. § 2319.

1  18 U.S.C. § 2319 is listed as a predicate offense in the definition of "racketeering activity" in

2  18 U.S.C. § 1961(1).

3  <u>Mail Fraud and Wire Fraud, 18 U.S.C. §§ 1341, 1343</u>

4         65.    As described herein, Defendants used the mails in furtherance of their scheme of

5  distributing counterfeit Roaring Glory Videos.    Defendants sent invoices, statements, order

6  confirmations, and received payments through the mail.  Defendants' customers were deceived

7  into believing they were ordering and purchasing genuine Roaring Glory Videos produced by

8  DSS, and they were not; they were ordering and receiving counterfeit, low-quality videos

9  produced by Defendants.    This was part of Defendants' scheme of distributing counterfeit

10 videos and was part of Defendants' scheme to defraud or to obtain money or property by

11 means of false or fraudulent pretenses, representations, or promises in which Defendants used

12 or caused others to use the mails in violation of 18 U.S.C. § 1341.

13        66.    As described herein, Defendants repeatedly used or caused others to use wire

14 communications in interstate commerce for the purpose of executing the scheme or artifice

15 devised by Defendants to defraud or to obtain money or property by means of false or

16 fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343.

17 Specifically, Defendants sent invoices, statements, order confirmations, and received payments

18 through the Internet.    Through these invoices, statements, and order confirmations,

19 Defendants' customers were deceived into believing they were ordering and purchasing

20 genuine Roaring Glory Videos produced by DSS, and they were not; they were ordering and

21 receiving counterfeit, low-quality videos produced by Defendants.

22        67.    The above-described conduct of Defendants constitutes a pattern of racketeering

23 activity as defined in RICO.  18 U.S.C. § 1961(5).

24        68.    As described herein, Defendants, and each of them, have conducted or

25 participated in, directly or indirectly, the conduct of the enterprise's affairs through a pattern or

26 racketeering activity in violation of 18 U.S.C. § 1962(c).

27        69.    As a direct and proximate result of Defendants' conduct as described herein,

28 DSS has been injured in the form of lost sales, lost profits, and a reduction in market price for

weintraub genshlea chediak
LAW CORPORATION

genuine Roaring Glory Videos because Defendants were selling the counterfeit videos at a price much lower than the retail price set by DSS.  DSS continues to be injured by this reduction in market price as it will take many years for the market to recover to the point where DSS can charge its customary, proper retail price.  As a result, DSS has therefore been injured in its business or property by reason of the above-described violation of 18 U.S.C. § 1962(c).  DSS is thus entitled to recover threefold the damages it has sustained, plus its costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, DSS prays for judgment as set forth below.

### FIFTH CLAIM FOR RELIEF

### (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))

### (Against All Defendants)

70.    DSS realleges and incorporates herein by reference the allegations in paragraphs 1 through 64 above as if set forth in full.

71.    DSS is informed and believes, and thereon alleges, that Defendants, and each of them, conspired and agreed with each other to conduct or participate in, directly or indirectly, the conduct of the enterprise's affairs through the pattern or racketeering activity herein described.    Defendants, and each of them, agreed to the scheme of copying, marketing, distributing, and selling counterfeit copies of DSS's Roaring Glory Videos.

72.    DSS is informed and believes, and thereon alleges, that Defendants committed several overt acts in furtherance of the conspiracy, including, but not limited to, entering into contracts with each other to replicate, distribute, market, and sell counterfeit copies of DSS's Roaring Glory Videos, actually replicating, distributing, marketing, and selling counterfeit copies of DSS's Roaring Glory Videos, and receiving payment for these acts.

73.    By conspiring with each other to conduct or participate in, directly or indirectly, the conduct of the enterprise's affairs through the pattern of racketeering activity herein described, Defendants, and each of them, have violated 18 U.S.C. § 1962(d).

74.    As a direct and proximate result of Defendants' conduct as described herein, DSS has been injured in the form of lost sales, lost profits, and a reduction in market price for

weintraub genshlea chediak
LAW CORPORATION

1   genuine Roaring Glory Videos because Defendants were selling the counterfeit videos at a

2   price much lower than the retail price set by DSS.  DSS continues to be injured by this reduction

3   in market price as it will take many years for the market to recover to the point where DSS can

4   charge its customary, proper retail price.  As a result, DSS has therefore been injured in its

5   business or property by reason of the above-described violation of 18 U.S.C. § 1962(d).  DSS

6   is thus entitled to recover threefold the damages it has sustained, plus its costs and reasonable

7   attorneys' fees pursuant to 18 U.S.C. § 1964(c).

8            WHEREFORE, DSS prays for judgment as set forth below.

9

10                              <u>PRAYER</u>

11                   AS TO THE FIRST CLAIM FOR RELIEF

12                        (Copyright Infringement)

13                        (Against All Defendants)

14            1.    For an order requiring Defendants, and each of them, to show cause, if any they

15   have, why they should not be enjoined as hereinafter set forth, during the pendency of this

16   action, pursuant to 17 U.S.C. § 502;

17            2.    For a temporary restraining order, a preliminary injunction, and a permanent

18   injunction, all requiring Defendants, and each of them, and their respective officers, directors,

19   agents, attorneys, servants and employees, and all persons acting under, in concert with, or for

20   them:

21            a.    to refrain from manufacturing, replicating, marketing, selling, distributing,

22   or copying the Roaring Glory Videos without express, written authorization from DSS;

23            b.    to turn over to DSS or destroy all copies of any of the Roaring Glory

24   Videos in their control or possession;

25            3.    For actual damages and Defendants' profits pursuant to statute, 17 U.S.C. §

26   504;

27            4.    For statutory damages pursuant to 17 U.S.C. § 504;

28            5.    For costs of suit and Plaintiff's reasonable attorneys' fees according to statute,

weintraub genshlea chediak
LAW CORPORATION

17 U.S.C. § 505.

### AS TO THE SECOND CLAIM FOR RELIEF

### (Trafficking in Counterfeit Labels, 18 U.S.C. § 2318)

### (Against All Defendants)

6.    For damages according to proof pursuant to statute, 18 U.S.C. § 2318(e)

7.    For costs and Plaintiff's reasonable attorneys' fees according to statute, 18 U.S.C. § 2381(e)

### AS TO THE THIRD CLAIM FOR RELIEF

### (Trademark Infringement)

### (Against All Defendants)

8.    For an order requiring Defendants, and each of them, to show cause, if any they have, why they should not be enjoined as hereinafter set forth, during the pendency of this action;

9.    For a temporary restraining order, a preliminary injunction, and a permanent injunction, all requiring Defendants, and each of them, and their respective officers, directors, agents, attorneys, servants and employees, and all persons acting under, in concert with, or for them:

a.    to refrain from infringing DSS's trademarks by manufacturing, replicating, marketing, selling, distributing, or copying the Roaring Glory Videos without express, written authorization from DSS;

b.    to turn over to DSS or destroy all copies of any of the Roaring Glory Videos in their control or possession;

10.    For actual damages according to proof, trebled pursuant to statute, 15 U.S.C. § 1117(a);

### AS TO THE FOURTH AND FIFTH CLAIMS FOR RELIEF

### (RICO)

### (Against All Defendants)

11.    For general damages according to proof at trial, trebled according to statute,

18 U.S.C. § 1962(c);

12.    For Plaintiffs' reasonable attorneys' fees according to statute, 18 U.S.C. § 1964(c).

## AS TO ALL CAUSES OF ACTION

### (Against All Defendants)

13.    For costs of suit; and

14.    For such other and further relief as the Court may deem just and proper.

Dated:  October 5, 2009              Respectfully submitted,

                                     **WEINTRAUB GENSHLEA CHEDIAK**
                                     Law Corporation


                                     By:____/s/ W. Scott Cameron_____
                                          W. Scott Cameron
                                          State Bar No. 229828

                                          Attorneys for Plaintiff
                                          Digital Software Services, Inc.


## DEMAND FOR JURY TRIAL

DSS hereby requests a trial by jury provided by Rule 38 of the Federal Rules of Civil Procedure.


Dated:  October 5, 2009              Respectfully submitted,

                                     **WEINTRAUB GENSHLEA CHEDIAK**
                                     Law Corporation


                                     By:____/s/ W. Scott Cameron_____
                                          W. Scott Cameron
                                          State Bar No. 229828

                                          Attorneys for Plaintiff
                                          Digital Software Services, Inc.